IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL L. TRAVIS, | ) | CASE NO. 4:15-cv-02515 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Michael L. Travis ("Plaintiff" or "Travis") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for Supplemental Security Income ("SSI").  Doc. 1, Doc. 13.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM**

the Commissioner's decision.

## I.  Procedural History

On March 22, 2012, Travis protectively filed[1] an application for SSI.[2]  Tr. 117-120, 128,

135.[3]  He alleged a disability onset date of January 24, 2012, due to obsessive compulsive

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 5/8/2018).

[2] Plaintiff had filed an earlier SSI application which was denied in January 2012.  Tr. 35-51.

[3] The transcript consists of two manually filed volumes.

disorder (OCD), anxiety, depression, bipolar disorder, back problems, neck pain, numbness in legs, feet and hands, and schizophrenia.  Tr. 86, 117, 128.  After initial denial by the state agency (Tr. 86-92) and denial upon reconsideration (Tr. 96-100), Travis requested a hearing (Tr. 101).  On March 27, 2014, Administrative Law Judge George A. Mills III ("ALJ") held a hearing.  Tr. 19.  On May 22, 2014, the ALJ issued a decision finding Travis not disabled within the meaning of the Social Security Act since March 22, 2012, the date the application was filed.  Tr. 16-32.  Travis requested review of the ALJ's decision by the Appeals Council.  Tr. 15.  On October 2, 2015, the Appeals Council denied Travis' request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 5-9.

On December 4, 2015, Travis filed a complaint in this Court seeking judicial review.  Doc. 1.  Also, in December 2015, Travis filed a subsequent SSI application.  Tr. 405.  On February 9, 2016, this Court granted Defendant's unopposed motion to remand the case for further administrative action because the recording of the hearing before the ALJ was blank and unrecoverable.  Tr. 470-473, Doc. 10, Doc. 11.  Following this Court's remand order, the Appeals Council issued an order vacating the final decision of the Commissioner, remanding the case to an administrative law judge for a *de novo* hearing, and directing the administrative law judge to consolidate the claim files, create a single paper record, and issue a new decision on the consolidated claims.  Tr. 405, 491.

On October 16, 2016, the ALJ conducted a hearing.  Tr. 423-469.  On December 9, 2016, the ALJ issued his decision (Tr. 402-422), finding that Travis had not been under a disability within the meaning of the Social Security Act since March 22, 2012, the date the application was filed (Tr. 406, 422).   The ALJ's December 9, 2016, decision became the final decision of the

Commissioner.[4]  A motion to reinstate case was filed and granted in June 2017 and, the case was

referred to the undersigned pursuant to Local Rule 72.2.  Doc. 12; 6/28/2017, non-document

order.

## II. Evidence[5]

### A.     Personal, educational, and vocational evidence

Travis was born in 1972 and he was 44 years old at the time of the October 16, 2016,

hearing.  Tr. 435.  Travis was married but separated and living apart from his wife.  Tr. 435.

They have a teenage son.  Tr. 435, 459.  Because Travis was not able to work, he was unable to

provide support for his wife or son.  Tr. 436.  Travis was living with his grandmother and

mother.  Tr. 436.  Travis attended school until the 11th grade.  Tr. 437.  He has tried to obtain a

GED but has been unable to pass the math portion.  Tr. 437.   Travis has past work as a brick and

block layer in construction, a laborer for welding and fabrication, and a finisher.  Tr. 439-442,

464.

### B.     Medical evidence

#### 1.     Treatment records

Starting in November 2006, Travis received mental health treatment from Dr. R. Kaza,

M.D., at Comprehensive Behavioral Health.  Tr. 174.  In March 2009, Dr. Kaza's diagnosis for

Travis was bipolar disorder, depressed.  Tr. 174.  Travis has also seen Amy S. Frampton, LISW,

for counseling (Tr. 363) and other medical care providers at Comprehensive Behavioral Health

---

[4] When the Federal court has remanded a case, if a claimant does not file exceptions to the administrative law judge's decision and the Appeals Council does not otherwise assume jurisdiction of the claimant's case, the administrative law judge's decision becomes the final decision of the Commissioner after remand.  *See* 20 C.F.R. § 416.1484(a) and (d).

[5] Travis' arguments in this appeal relate to his mental impairments.  Accordingly, the medical evidence summarized herein relates primarily to Travis' mental impairments.

(Tr. 174-196, 213-222, 365-395, 702-730, 822-871).  On April 27, 2009, Ms. Frampton indicated that Travis was being treated for bipolar disorder and was medication dependent.  Tr. 363.  She noted that Travis had had an increase in his symptoms due to extreme stress in his life; his insight and judgment were impaired; and he was disabled.  Tr. 363.  During a counseling session on October 5, 2011,[6] Travis was very nervous and agitated.  Tr. 214.  He and his wife were fighting and he had been trying to take care of his son who had been in a 4-wheel accident over the summer.  Tr. 214.  They were staying with Travis' dad.  Tr. 214.  Travis was frustrated with his wife.  Tr. 214.  She was always calling him when he was out trying to find work.  Tr. 214.  He was very angry.  Tr. 214.

During multiple visits with Dr. Kaza in 2012 for medication management and supportive therapy, Travis denied delusions and hallucinations and denied feeling homicidal or suicidal.  Tr. 384-385, 386-387, 388-389, 394-395.  He was receiving medication to treat depression and anxiety and to help him sleep.  Tr. 387, 388, 393, 395.  During a June 5, 2012, visit, Dr. Kaza observed that Travis' appearance was fair, his thought process was logical, he was oriented to time, place and person, and his insight and judgment were fair.  Tr. 395.  Travis denied substance abuse and was having no side effects from his medication.  Tr. 395.

Progress notes from a January 19, 2013, session reflect that Travis was cooperative but anxious and he had thoughts of hurting others.  Tr. 383.  Travis was having no problems with the medications he was taking at that time but he was only sleeping three or four hours at night.  Tr. 383.  The following month, Dr. Kaza recommended a decrease in Travis' benzodiazepines and recommended adding Vistaril.  Tr. 382.  Travis was very upset about this recommendation and refused to take Vistaril.  Tr. 382.  During an April 13, 2013, session, Travis reported being

---

[6] The counseling session notes are signed by an LISW but it is not clear that Ms. Frampton conducted the session. Tr. 216.

depressed all the time and being unable to sleep.  Tr. 380.  He had not slept in five days. Tr. 380.

Travis appeared anxious.  Tr. 380.  Travis' Valium was increased.  Tr. 380.  On May 11, 2013,

Travis reported being anxious and still unable to sleep.  Tr. 379.  He felt paranoid all the time; he

felt like someone was watching him.  Tr. 379.  Travis was cooperative during the session but

anxious.  Tr. 379.  On June 8, 2013, Travis reported no issues with his medications but he

reported having had three anxiety attacks that week.  Tr. 378.  He was observed to be talkative,

restless, oriented and cooperative.  Tr. 378.  On July 6, 2013, Travis still was not sleeping well.

Tr. 377.  He reported having anxiety.  Tr. 377.  During the July 6, 2013, session, Travis was

talkative and he had rapid speech.  Tr. 377.  He denied suicidal thoughts.  Tr. 377.  He was

functioning "fairly good."  Tr. 377.  Travis was counseled regarding the risk of taking

benzodiazepines and opiates together.  Tr. 377.  On August 31, 2013, Travis reported poor sleep,

paranoia, and hallucinations.  Tr. 376.  Travis stated he was bipolar, with manic episodes all the

time.  Tr. 376.  During the August 31, 2013, session, Travis was alert, oriented, and hypomanic.

Tr. 376.  His speech was rapid and pressured.  Tr. 376.  Travis' medications were reviewed and

adjusted.  Tr. 376.  As of September 26, 2013, Travis was taking Klonopin and Vistaril for

anxiety, Effexor for depression, Cogentin for side effects, and Zyprexa for mood stabilization.

Tr. 375.  Dr. Kaza discontinued the Valium.  Tr. 375.  On December 17, 2013, Travis was seen

and it was reported that Travis' wife felt that Travis needed a different anti-depressant because

Travis talked about suicide and was sad all the time; he was having really bad mood swings; and

the Effexor was causing emesis.  Tr. 372.  Travis indicated he had been at the hospital three

times in the last month due to anxiety attacks.  Tr. 372.  He relayed that he was going to jail for

about 20 days due to a probation violation.  Tr. 372.  Travis' medications were adjusted.  Tr. 372.

As of November 6, 2014, Travis was taking Valium, Vistaril, Zyprexa, and Effexor for treatment of his anxiety and depression and for mood stabilization. Tr. 368. Travis felt that it was the best combination of medication that he had been on. Tr. 368. Travis reported that his mood swings had improved since taking Zyprexa. Tr. 365. Travis still experienced irritability but was much better with medication. Tr. 365. The Valium was helping Travis with his sleep. Tr. 365. He denied nightmares and hallucinations. Tr. 365. He was having suicidal thoughts but denied having a suicidal plan. Tr. 365. Although recommended, Travis refused psychotherapy. Tr. 368.

Travis continued treatment throughout 2015. Tr. 703-727. Travis was doing "pretty good" as of January 13, 2015. Tr. 703. Travis felt that his medications were starting to work better. Tr. 703. His sleep had improved. Tr. 703. The voices in his head were less frequent and there were no command hallucinations. Tr. 703. Travis sometimes had thoughts of hurting someone that were not directed at any particular person. Tr. 703. But, taking a Valium helped calm him and take away those feelings. Tr. 703. He was still having anxiety attacks. Tr. 703. He was observed to have a bright mood; his behavior was appropriate and his functioning was good. Tr. 703. During a February 10, 2015, visit, Travis' mood was described as "pleasant, happy[.]" Tr. 705. The nurse treating Travis during the February 10 visit noted that Travis was making progress – he was "improving greatly" and was "calm [and] positive[.]" Tr. 706. On April 4, 2015, Travis reported that the voices were gone with medication. Tr. 707. Travis' mood was described as "bright, anxious[.]" Tr. 707. His thought process was logical and he was alert, oriented and cooperative. Tr. 707. As of May 2015, Travis was continuing to report no hallucinations or suicidal thoughts. Tr. 709. However, he was starting to get a little bit of the

paranoia back.  Tr.  709.  When leaving his house, he felt like people were following him and it was causing him high anxiety.  Tr. 709.

On June 3, 2015, Travis reported that he was doing well on his medication.  Tr. 711. Other than some anxiety, Travis felt stable.  Tr. 711.  On August 11, 2015, Travis reported having a lot of anxiety but he had not had any medications since the 4th of that month.  Tr. 715. He and his wife were separated and he was living with his grandmother who had a stroke.  Tr. 715.  During an October 6, 2015, visit, Travis reported being depressed and not wanting to do anything.  Tr. 718.  His sleep was not too bad and he was not hearing voices or seeing shadows but he was still struggling with paranoid feelings.  Tr. 718.  He reported that he was continuing to take all his medication.  Tr. 718.  The following month, on November 5, 2015, Travis reported that his medications were not helping – the voices were back in his head telling him to do "bad things, hurt and kill people," he was having really bad mood swings, he was having anxiety daily, he was paranoid, and he was getting only 2 hours of sleep each night.  Tr. 720.  During the visit, Travis was observed to be anxious; his speech was pressured; and his behavior was constricted.  Tr. 720.  Travis was started on Seroquel to address the increase in hallucinations. Tr. 721.  He could also take a Trazadone if he was unable to sleep taking the Seroquel.  Tr. 721. The Seroquel that was prescribed was not approved.  Tr. 722.  Since Zyprexa was not helping his mood, Travis still wanted to try Seroquel.  Tr. 722.  Travis was provided a 15-day sample pack of Seroquel XR.  Tr. 722.  On December 4, 2015, Travis had a therapy session with Ms. Frampton.  Tr. 723.  He reported being more depressed with the holidays.  Tr. 723.  He was paranoid and hated to leave the house.  Tr. 723.  He reported suicidal thoughts and auditory hallucinations.  Tr. 723.  Travis also had a medication management appointment on December 4, 2015.  Tr. 725.  Travis indicated that he was sleeping better and his mood had been better since

starting on Seroquel XR. Tr. 725. He was more depressed and his anxiety was high due to the holidays and financial issues. Tr. 725. He denied panic attacks but was having paranoid thoughts and hearing commands to hurt people. Tr. 725. Travis understood that the commands were not real and was not acting upon them. Tr. 725. Since Travis' insurance did not cover Seroquel XR, Travis was switched to Seroquel. Tr. 726.

During treatment sessions in 2016, Travis reported an increase in his symptoms. Tr. 844-860. He was continuing to struggle with anxiety, paranoia, poor sleep and hearing voices. Tr. 844, 845, 847, 850, 858. On April 29, 2016, Comprehensive Behavioral Health completed a psychiatric assessment reevaluation. Tr. 862-871. At that time, Travis was taking Abilify for his moods, Valium for his anxiety, Restoril for his sleep, psychosis, and Prozac for his depression. Tr. 863. He indicated that the Abilify and Valium were somewhat effective, the Restoril was not effective, and the Prozac was effective. Tr. 863. Travis was smoking marijuana daily and felt that it helped and he could discontinue the Valium. Tr. 869. Travis was diagnosed with schizoaffective disorder, PTSD, unspecified bipolar disorders, anxiety disorder, and marijuana dependence. Tr. 869. It was recommended that Travis continue with medication management, therapy, and case management services. Tr. 869. Travis's Abilify was increased to assist with his sleep and moods. Tr. 870. His Restoril and Prozac were continued and the Valium was discontinued. Tr. 870.

In May 2016, Travis reported improvement with some symptoms. Tr. 855. His hallucinations had decreased and his moods had stabilized. Tr. 855. Travis had good and bad days with his hallucinations and mood swings. Tr. 855. He felt his depression was controlled with Prozac. Tr. 855. Travis' mood was euthymic; he was alert and oriented; his thought process was logical; and his behavior was appropriate. Tr. 855. The next month, Travis was

reporting poor sleep and hearing voices all the time.  Tr. 858.  His mind was constantly racing

and he was feeling really anxious.  Tr. 858.  He denied depression and thoughts of hurting

himself.  Tr. 858.  Travis reported smoking marijuana.  Tr. 859.  Adjustments were made to

Travis' medications.  Tr. 859.

> ## 2. Medical statements and/or opinion evidence

> ### a. Treating source

Dr. Kaza completed a number of different reports/opinions during his treatment

relationship with Travis, which are discussed below.

## 2009

In a report completed for the Bureau of Disability Determination on March 22, 2009, Dr.

Kaza indicated that Travis' speech was pressured; his mood was depressed; and his affect was

appropriate to his mood.  Tr. 174.  Travis complained of getting panic attacks and being nervous

around people.  Tr. 174.  Travis denied hallucinations or delusions.  Tr. 174.  His concentration

was poor and his fund of information was average.  Tr. 174.  Travis denied alcohol or substance

abuse.  Tr. 174.  He complained of rages and getting angry feelings.  Tr. 174.  Dr. Kaza's

diagnosis at that time was bipolar disorder, depressed.  Tr. 174.  Dr. Kaza indicated that Travis

was not responding well to his medication.  Tr. 175.  Dr. Kaza opined that Travis' ability to

remember/understand/follow directions; ability to maintain attention; ability to sustain

concentration, persist at tasks, etc.; ability to engage in social interaction; and adaptation ability

were poor.  Tr. 175.  Dr. Kaza also opined that Travis could not tolerate the pressure of a work

setting.  Tr. 175.

**2012**

On May 23, 2012, Dr. Kaza completed a Mental Capacity Assessment. Tr. 264-266. The Assessment was a check-box style form. Tr. 264-266. Dr. Kaza's diagnosis was bipolar disorder, NOS. Tr. 264.

In the area of understanding and memory, Dr. Kaza opined that Travis had moderate limitations in his ability to remember locations and work-like procedures and in his ability to understand and remember very short and simple instructions and marked limitations in his ability to understand and remember detailed instructions. Tr. 264. When asked to describe the medical/clinical findings that supported his assessment in this area, Dr. Kaza indicated that Travis complained of forgetfulness; felt that somebody was watching him; and claimed he could not stay on task. Tr. 264.

In all but one out of the ten categories rated in the area of sustained concentration and persistence, Dr. Kaza opined that Travis had marked limitations. Tr. 264-265. In one area – ability to work in coordination with or in proximity to others without being distracted by them – Dr. Kaza opined that Travis had moderate limitations. Tr. 265. When asked to describe the medical/clinical findings that supported his assessment in the area of sustained concentration and persistence, Dr. Kaza indicated that Travis complained of difficulties in concentration and being unable to stay focused on anything. Tr. 65.

In the area of social interaction, Dr. Kaza opined that Travis had marked limitations in his ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. 265. He also opined that Travis had

moderate limitations in his ability to ask simple questions or request assistance and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  Tr. 265. Dr. Kaza provided no comments when asked to describe the medical/clinical findings that supported his assessment in the area of social interaction.  Tr. 265.

In the area of adaptation, Dr. Kaza opined that Travis had marked limitations in his ability to respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others.  Tr. 266.  Dr. Kaza also opined that Travis had moderate limitations in his ability to travel in unfamiliar places or use public transportation.  Tr. 266.  When asked to describe the medical/clinical findings that supported his assessment in the area of adaptation, Dr. Kaza indicated that Travis had complained of difficulty in taking public transportation.  Tr. 266.  Dr. Kaza also opined that Travis would likely have three work absences in an average month.  Tr. 265.

On June 5, 2012, Dr. Kaza completed a Mental Status Questionnaire.  Tr. 269-271.  In that Questionnaire,[7] Dr. Kaza indicated that Travis' appearance was fair; Travis was hearing voices in his head all the time, which were telling him to hurt people; Travis' concentration was not very good, e.g., Travis was taking GED classes but was not able to concentrate; and Travis denied alcohol or other substance use.  Tr. 269.  Dr. Kaza reported that he had diagnosed Travis with bipolar disorder, NOS, which Travis had had for 10 years.  Tr. 270.  Travis' medications included lithium, Risperdal and valium.  Tr. 270.  When asked to describe Travis' ability to remember, understand and follow directions, Dr. Kaza indicated "client says he cannot."  Tr. 270.  Dr. Kaza opined that Travis' ability to maintain attention and sustain concentration, persist

---

[7] The handwriting in the Questionnaire is not entirely legible.  Tr. 269-271.

at tasks, and complete them in a timely fashion was poor.  Tr. 270.  As far as Travis' ability to engage in social interaction, Dr. Kaza noted that Travis indicated that he did not have any interaction.  Tr. 270.  Dr. Kaza rated Travis' ability to adapt as poor.  Tr. 270.  When asked how Travis would react to the pressures, in a work setting or elsewhere, involved in simple and routine or repetitive tasks, Dr. Kaza noted that Travis indicated he did not work and could not handle.  Tr. 270.

### **2014**

On February 13, 2014, Dr. Kaza completed a Mental Capacity Assessment.  Tr. 358-361. The Assessment was a check-box style form.  Tr. 358-360.

In the area of understanding and memory, Dr. Kaza opined that Travis had marked limitations in all three categories – ability to remember locations and work-like procedures; ability to understand and remember very short and simple instructions; and ability to understand and remember detailed instructions.  Tr. 358.  When asked to describe the medical/clinical findings that supported his assessment in this area, Dr. Kaza provided no comments.  Tr. 358.

In the area of sustained concentration and persistence, Dr. Kaza opined that Travis had moderate limitations in his ability to carry out very short and simple instructions; ability to work in coordination with or in proximity to others without being distracted by them; ability to make simple work-related decisions; and ability to perform at a consistent pace with a standard number and length of rest periods.  Tr. 358-359.  Dr. Kaza opined that Travis had marked limitations in his ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to sustain an ordinary routine without special supervision; ability to complete a normal workday without interruptions from psychologically based symptoms; and ability to complete a normal workweek without interruptions from psychologically based

symptoms.  Tr. 358-359.  Dr. Kaza opined that Travis had extreme limitations in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  Tr. 358.  When asked to describe the medical/clinical findings that supported his assessment in the area of sustained concentration and persistence, Dr. Kaza indicated that Travis complained of having a hard time remembering things.  Tr. 359.

In the area of social interaction, Dr. Kaza opined that Travis had slight limitations in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  Tr. 359.  Dr. Kaza opined that Travis had moderate limitations in his ability to interact appropriately with the general public; ability to ask simple questions or request assistance; and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Tr. 359.  Dr. Kaza opined that Travis had marked limitations in his ability to accept instructions and respond appropriately to criticism from supervisors.  Tr. 359.  When asked to describe the medical/clinical findings that supported his assessment in the area of social interaction, Dr. Kaza provided no comments.  Tr. 359.

In the area of adaptation, Dr. Kaza opined that Travis had moderate limitations in his ability to respond appropriately to changes in the work setting and ability to be aware of normal hazards and take appropriate precautions.  Tr. 360.  Dr. Kaza opined that Travis had marked limitations in his ability to travel in unfamiliar places or use public transportation, noting that Travis gets paranoid and thinks that people are watching him; and marked limitations in his ability to set realistic goals or make plans independently of others.  Tr. 360.  When asked to describe the medical/clinical findings that supported his assessment in the area of adaptation, Dr. Kaza stated that Travis could not use good judgment; he is suffering from bipolar disorder.  Tr. 360.  Dr. Kaza also opined that Travis would likely have four or more absences from work in an

13

average month.  Tr. 359.  Dr. Travis indicated he had treated Travis since 2006 and it was his

opinion that Travis had the limitations and restrictions set forth in the Mental Capacity

Assessment since 2006.  Tr. 361.

### b.    Consultative examiner

Dr. Claudia E. Johnson Brown, Ph.D., conducted two consultative evaluations.  The first

was conducted on September 25, 2012.[8]  Tr. 272-281.  The second was conducted on June 7,

2016.[9]  Tr. 731-740.  Also, in June 2016, Dr. Johnson Brown completed a Medical Source

Statement of Ability to Do Work-Related Activities (Mental) ("MSS").  Tr. 741-743.

### <u>2012</u>

Based on her 2012 evaluation, Dr. Johnson Brown diagnosed Travis with schizoaffective

disorder, bipolar type; panic disorder with agoraphobia; and PTSD.  Tr. 281.  Dr. Johnson Brown

assigned a GAF score of 35.[10]  Tr. 281.   Dr. Johnson offered her functional assessment of

Travis' abilities in the following areas: abilities and limitations in understanding, remembering,

and carrying out instructions; abilities and limitations in maintaining attention and concentration,

and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks;

abilities and limitations in responding appropriately to supervision and to coworkers in a work

---

[8] Dr. Johnson Brown's report is dated September 26, 2012.  Tr. 272.

[9] Dr. Johnson Brown's report is dated June 13, 2016.  Tr. 731.

[10] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and
occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric
Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.
Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 31 and 40
indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or
irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or
mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger
children, is defiant at home, and is failing at school)."  *Id.*  With the publication of the DSM-5 in 2013, the GAF was
not included in the DSM-5.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental
Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

setting; and abilities and limitations in responding appropriately to pressures in a work setting. Tr. 279-280.

With respect to Travis' abilities and limitations in understanding, remembering, and carrying out instructions, Dr. Johnson Brown opined that Travis would have little difficulty understanding and carrying out instructions and little difficulty comprehending what he was being asked to do but he may have difficulty remembering instructions since memory deficits were noted during the interview.  Tr. 279.

With respect to Travis' abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks, Dr. Johnson Brown opined that Travis would be able to perform simple tasks but multi-step tasks could be too difficult for Travis to complete because of his diminished memory.  Tr. 279.

With respect to Travis' abilities and limitations in responding appropriately to supervision and to coworkers in a work setting, based on Travis' reports of difficulty getting along with others when he was working, paranoia, visual and auditory hallucinations, mood swings, increased irritability, racing thoughts, engagement in risky and impulsive behavior, and panic attacks when leaving his home, Dr. Johnson Brown opined that it would be more difficult for Travis to interact appropriately with coworkers and supervisors.  Tr. 279.

With respect to Travis' abilities and limitations in responding appropriately to pressures in a work setting, Dr. Johnson Brown opined that the psychological symptoms that Travis indicated he was experiencing would interfere greatly with his ability to withstand the stresses and pressures associated with day-to-day work activity or pressures of any sort.  Tr. 280.

## 2016

Based on her 2016 evaluation, Dr. Johnson Brown diagnosed Travis with schizoaffective disorder, bipolar type; panic disorder; unspecified anxiety disorder; PTSD; and cannabis use disorder.  Tr. 739.  Dr. Johnson offered her functional assessment of Travis' abilities in the following areas: abilities and limitations in understanding, remembering, and carrying out instructions; abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks; abilities and limitations in responding appropriately to supervision and to coworkers in a work setting; and abilities and limitations in responding appropriately to pressures in a work setting. Tr. 738-739.

With respect to Travis' abilities and limitations in understanding, remembering, and carrying out instructions, Dr. Johnson Brown opined that Travis would have little difficulty understanding, remembering and carrying out instructions and no difficulty comprehending what he was being asked to do.  Tr. 738.

With respect to Travis' abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks, Dr. Johnson Brown opined that Travis' ability to maintain attention and concentration in order to perform simple and multi-step tasks appeared to be notably impaired. Tr. 738.   In offering this opinion, Dr. Johnson Brown indicated that Travis stated that he has difficulty reading due to concentration problems; he does not complete household chores; and his wife takes care of the family's personal business.  Tr. 738.

With respect to Travis' abilities and limitations in responding appropriately to supervision and to coworkers in a work setting, based on Travis' reports of difficulty getting along with others when he was working, paranoia, visual and auditory hallucinations, mood instability with psychotic features; mood swings, increased irritability, racing thoughts, engagement in risky and impulsive behavior, and panic attacks when leaving his home, Dr. Johnson Brown opined that it would be more difficult for Travis to interact appropriately with coworkers and supervisors.  Tr. 739.

With respect to Travis' abilities and limitations in responding appropriately to pressures in a work setting, Dr. Johnson Brown opined that the psychological symptoms that Travis indicated he was experiencing would interfere greatly with his ability to withstand the stresses and pressures associated with day-to-day work activity or pressures.  Tr. 739.

In the MSS, Dr. Johnson Brown found that, in the area of understanding, remembering and carrying out instructions, Travis had no limitations in his ability to understand and remember simple instructions or carry out simple instructions; mild limitations in his ability to understand and remember complex instructions or carry out complex instructions; and marked limitations in his ability to make judgments on simple work-related tasks or make judgments on complex work-related tasks.  Tr. 741.  As further explanation, Dr. Johnson Brown indicated that Travis' psychotic symptoms of auditory and visual hallucinations markedly affected his judgment; he misperceives reality and the intentions of others; and he believes that people are following him around to harm him.  Tr. 741.  In the area of interacting appropriately with supervision, co-workers and the public, Dr. Johnson Brown found that Travis had extreme limitations in his ability to interact appropriately with the public, supervisors, and co-workers and in his ability to respond appropriately to usual work situations and to changes in a routine work setting.  Tr. 742.

Dr. Johnson Brown explained further that Travis experiences command auditory hallucinations that tell him to harm others; he has been involved in physical fights at work; and he believes that others are out to harm him. Tr. 742. In response to a question regarding alcohol and/or substance abuse impairments, Dr. Johnson Brown noted that Travis reported daily use of cannabis to relieve symptoms of anxiety. Tr. 742.

### c. State agency reviewers

On March 12, 2016, state agency reviewing psychologist Bonnie Katz, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 480-481) and a Mental RFC Assessment (Tr. 484-486). In the PRT, Dr. Katz opined that Travis had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of an extended duration. Tr. 481. In 2012, state agency reviewing psychologists also reached the same opinion as Dr. Katz, i.e., that Travis had no more than moderate limitations in the domains of activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. Tr. 63, 77.

In assessing Travis' RFC, Dr. Katz opined that Travis could perform work involving one-to-three step simple, repetitive tasks in environments without strict production quotas or fast-paced demands, with occasional and superficial interaction with the public, supervisors, and co-workers, and in an environment that requires no more than occasional decision-making and where changes are infrequent and explained fully. Tr. 485-486.

## C.      Hearing testimony

### 1.      Plaintiff's testimony

Travis testified and was represented at the October 16, 2016, hearing.  Tr. 428, 435-461, 464.   Travis lost his driver's license due to a history of DUIs and he has not gotten his license back because he has a lot of reinstatement fines and would have to go back to driving school and do some other things.  Tr. 436.  Travis' cousin drove him to the administrative hearing.  Tr. 437. Travis reported a history of using illegal substances and alcohol which led to some criminal activity.  Tr. 442-443.  With the exception of smoking marijuana at times, Travis indicated he was clean from drugs for seven years.  Tr. 442-443, 457-458, 460.  His drug of choice was crack. Tr. 443.  With some tough love from his mom and her late husband, Travis was able to stop using drugs on his own.  Tr. 457.  Travis indicated he had smoked marijuana more recently but he stopped smoking it because it was making him paranoid and making his anxiety worse.  Tr. 460, 461-462.

Travis has been seeing Dr. Kaza since 2006 and sees Dr. Kaza every month for mental health treatment.  Tr. 446, 449.  He also sees a therapist in Dr. Kaza's office once a month.  Tr. 449.  Travis has bipolar disorder, anxiety, depression, and PTSD.  Tr. 450.  Dr. Kaza prescribes Prozac, Abilify and Trazadone.  Tr. 449.  Travis has problems being around people, especially in crowds.  Tr. 449-450.  For example, he indicated is cannot go to Walmart to shop.  Tr. 450.  He can only be around three or four people.  Tr. 450.  Otherwise, he starts having panic attacks.  Tr. 450.  When Travis has a panic attack, he feels like he is having a heart attack.  Tr. 450-451. Travis reported having good and bad days.  Tr. 455.  He explained that a good day means he does not have a panic attack or breakdown and flip out and want to kill someone, which is what

he would describe as a bad day.  Tr. 455-456.  Travis has about four or five bad days each week.  Tr. 456.  Since filing his disability application in 2012, Travis feels that his mental health problems have gotten worse.  Tr. 458-459.  He hears voices more often than he used to, telling him to kill and hurt people.  Tr. 459.  He experiences hallucinations almost daily.  Tr.459.  He is paranoid.  Tr. 459.  For example, whenever he is in a crowd, he feels like people are following him.  Tr. 459.

Travis is able to take care of his personal hygiene, shower, bathe and dress himself.  Tr. 452.  His mom cooks for him and does the laundry.  Tr. 452.  Occasionally, Travis tries to assist with household chores but it usually causes him too much pain.  Tr. 453.  On a typical day, Travis wakes up around 5:00 a.m.; has a cup of coffee with his mom; and watches television most of the day.  Tr. 452.  He usually sits in a recliner chair.  Tr. 457.  On occasion, Travis uses a computer and he has a smartphone that he uses for phone calls.  Tr. 452-453.  Travis used to play video games but he is unable to play them anymore due to a lack of concentration.  Tr. 454.  When he did play video games, he could concentrate for 20 minutes at most and then would quit.  Tr. 456.  He does not read anymore because he cannot concentrate.  Tr. 456.  He can read maybe two or three pages and then he has to put the book down.  Tr. 456.  Travis has also stopped hunting and fishing.  Tr. 454.  As far as hunting, he is not allowed to have a gun because of his felony and physically he is no longer able to shoot a gun.  Tr. 454.  Travis goes shopping for food about once a month.  Tr. 453.  Other times, he makes a list and gives it to his mom.  Tr. 453.  Travis' mom takes him to medical appointments.  Tr. 453.  He also uses a non-emergency medical transportation service.  Tr. 453-454.  Travis socializes with his mom and grandmother.  Tr. 457.  Since he stopped using drugs, he does not have friends.  Tr. 457.  The friends he had are still using drugs and he has nothing to do with them.  Tr. 457.

### 2.      Vocational expert's testimony

Vocational Expert Gina Baldwin ("VE") testified at the hearing.  Tr. 464-467.  The VE identified Travis' past work as medium, semi-skilled work.  Tr. 464-465.  The ALJ asked the VE to consider a younger individual, someone between the ages 39-44, with limited education and no prior full-time work activity who is limited to sedentary work (lifting only 10 pounds occasionally and 5 pounds or less on a frequent basis; standing and walking is only required for 2 hours out of an 8-hour day; and sitting 6-8 hours with normal breaks); no climbing of any ladders, ropes or scaffolding; only occasional climbing of ramps or stairs; only occasional balancing, stooping, kneeling, crouching or crawling; no overhead reaching with bilateral upper extremities; avoidance of concentrated exposure to temperature extremes, full body vibration and hazards, with no hazards meaning no working around moving plant machinery or unprotected heights; limited to simple, unskilled work; only occasional interaction with supervisors, co-workers, and the public; work must be low stress, no rapid production quotas or assembly line work; and limited decision making responsibility and few changes, meaning occasional changes in the work setting.  Tr. 465-466.   The ALJ then asked the VE whether there would be any jobs that exist in the national or regional economy available to the described individual.  Tr. 466. Utilizing a regional area comprised of West Virginia, Kentucky and Ohio, the VE indicated that there would be unskilled jobs available, including (1) table worker – 1,000 jobs available regionally and 35,000 available nationally; (2) sorter – 1,500 jobs available regionally and 50,000 available nationally; and (3) final assembler – 900 jobs available regionally and 25,000 nationally.  Tr. 466.

The ALJ then asked the VE whether there would be jobs available if an individual would be off task a third or more of an 8-hour workday because of marked deficiencies in attention,

concentration, and pace.  Tr. 466.  The VE indicated that there would be no jobs available for the described individual.  Tr. 467.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his December 9, 2016, decision, the ALJ made the following findings:[11]

1.      Travis has not engaged in substantial gainful activity since March 22, 2012, the application date.  Tr. 408.

2.      Travis has the following severe impairments: degenerative disc disease of the cervical spine; degenerative disc disease of the lumbar spine; history of bilateral osteochondritis of the knees; non-specific hand symptoms; schizoaffective disorder, bipolar type; obsessive compulsive disorder (OCD); panic disorder; unspecified anxiety disorder; post-traumatic stress disorder (PTSD); and cannabis use.  Tr. 408.

3.      Travis does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments, including Listing 12.04 (affective disorders).  Tr. 408-411.

4.      Travis has the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a) (i.e., is able to occasionally lift and/or carry no more than 10 pounds; frequently lift and/or carry articles like docket files, ledgers, and small tools; stand and/or walk with normal breaks for a total of 2 hours in an 8-hour workday; sit with normal breaks for a total of about 6 hours in an 8-hour workday), except he can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; can never overhead reach with the bilateral upper extremities; must avoid concentrated exposure to temperature extremes, vibration, and

---

[11] The ALJ's findings are summarized.

hazards of moving plant machinery and unprotected heights; is limited to simple, unskilled work, in a low stress work setting, with no rapid production or assembly line work, with limited decision making responsibility, and few, no more than occasional, changes in the work setting; and is capable of occasional interaction with supervisors, co-workers, and the general public.  Tr. 411-420.

5.      Travis is unable to perform past relevant work.  Tr. 420.

6.      Travis was born in 1972 and was 39 years old, defined as a younger individual age 18-44, on the date the application was filed.  Tr. 420.

7.      Travis has a limited education and is able to communicate in English.  Tr. 421.

8.      Transferability of job skills is not material to the determination of disability.  Tr. 421.

9.      Considering Travis' age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Travis can perform, including table worker, sorter, and final assembler.  Tr. 421-422.

Based on the foregoing, the ALJ determined that Travis had not been under a disability, as defined in the Social Security Act, since March 22, 2012, the date the application was filed. Tr. 422

## V. Plaintiff's Argument

Travis' sole argument is focused on the ALJ's Step Three finding.  He argues that the ALJ did not properly weigh the opinion of his treating psychiatrist or the consultative examining psychologist and therefore erred when he concluded that Travis' mental impairments did not meet or equal Listing 12.04 (affective disorders).

## VI. Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.     The ALJ did not err at Step Three or in weighing the medical opinion evidence**

Travis argues that the ALJ erred at Step Three by finding that his mental impairments did not meet or equal Listing 12.04 and by not properly weighing the opinion of his treating psychiatrist Dr. Kaza and examining psychologist Dr. Johnson Brown.  Doc. 17, pp. 14-20, Doc. 20.  Travis claims there is evidence sufficient to satisfy the requirements in both subdivisions A and B of Listing 12.04.  Doc. 17, pp. 14-20, Doc. 20.

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment(s) meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 416.920(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or equals a Listing.  *Thacker v. SSA*, 93 Fed. Appx. 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).  Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Thacker* 93 Fed. Appx. at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)).  "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing.'"  *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011).  "A claimant must satisfy all the criteria to 'meet' the listing."  *Id.*  "[A]claimant is also disabled if her impairment is the *medical equivalent* of a listing[.]"  *Id.*  (emphasis in original).  In assessing equivalency, an ALJ "looks to the opinions of the state agency medical advisors and/or the opinion of a testifying medical expert for guidance on the issue of whether the medical findings are at least equal in severity and duration of the listing findings."  *Johnson v. Colvin*, 2014 WL 1418142, *3 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. § 404.1526).  There is no heightened articulation standard at Step Three.  *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411 (6th Cir. Jan. 31, 2006) (unpublished).

Listing 12.04 states:[12]

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

---

[12] This version of Listing 12.04 was in effect at the time of the ALJ's December 9, 2016, decision.

A.  Medically documented persistence, either continuous or intermittent, of one of the following:

1.  Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions, or paranoid thinking; or

2.  Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or
b. Pressure of speech; or
c. Flight of ideas; or
d. Inflated self-esteem; or
e. Decreased need for sleep; or
f. Easy distractibility; or
g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
h. Hallucinations, delusions or paranoid thinking;

or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration; . . .[13]

20 C.F.R. § Pt. 404, Subpt. P, Appx. 1, Pt. A2 (effective 9/26/2016 to 1/16/2017).

---

[13] Travis does not argue that he meets or equals Listing 12.04(C).  Accordingly, although the ALJ discussed Listing 12.04(C) and concluded that Travis' impairments did not meet its requirements, it is not quoted herein.

At Step Three, the ALJ analyzed Travis' mental impairments under Listing 12.04 and concluded that Travis did not have an impairment or combination of impairments that met or equaled the criteria for Listing 12.04 (affective disorders).  Tr. 408-411.   In assessing Travis' impairment(s) under Listing 12.04, the ALJ stated the following regarding the "paragraph B" criteria:

> In activities of daily living, the claimant has moderate restrictions.  The claimant testified that he currently lives with his grandmother and mother.  He has no driver's license, due to a history of DUIs.  He testified his mother cooks and washes his laundry for him, but that he is able to care for his personal hygiene, watch television, use a computer, use a smart phone, and shop in stores once a month.  Further, during his most recent mental treatment notes, it is notes that the claimant helps his mother and grandmother around the house (Exhibit B19F).  Overall, the evidence is consistent with no more than moderate limitations in this domain.
>
> In social functioning, the claimant has moderate difficulties.  The claimant reports difficulties around others and panic attacks.  However, the mental status consultative examiner assessed the claimant as angry, with an abnormal mood and affect, but further assessed the claimant as alert, fully oriented, with normal eye contact, normal speech, and adequate grooming and hygiene (Exhibits 10F and 20F).  He does not belong to any groups or organizations, but as noted above, he lives with his mother and grandmother.  Further, at the hearing, the undersigned witnessed the claimant[] behaving in a socially appropriate manner.  Overall, the evidence is consistent with no more than moderate limitations in this domain.
>
> With regard to concentration, persistence or pace, the claimant has moderate difficulties.  The claimant reports poor concentration and that he experiences auditory and visual hallucination[s].  While the mental status consultative examination found the claimant to have notably impaired concentration, she further assessed the claimant with intact immediate recall (Exhibits 10F and 20F).  Further, the claimant reports that he watches television, uses a smart phone, and uses the computer, all of which require some ability to maintain concentration.  Further, he reports that he manages his own finances (Exhibit B3E).  Additionally, at the hearing, the claimant was able to follow along and respond to questions regarding his past work and medical history without significant difficulty.  Overall, the evidence is consistent with no more than moderate limitations in this domain.
>
> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.  There is no evidence of inpatient hospitalizations or other acute exacerbations of symptoms that would arise to the level of an episode of decompensation (*see* Exhibits 1F-25F).

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

In reaching this decision, the State agency consultant's psychiatric review techniques are accorded great weight, as their determination that the claimant has no more than moderate limitations in the first three domains of functioning and has had no episodes of decompensation, are consistent with the claimant's self-reported activities of daily living, the mental status examination findings, and the claimant's presentation at the hearing, all as detailed fully above (Exhibits B2A, B4A, and[] B10A[)].

Tr. 409-410.

The ALJ's Step Three finding is sufficiently explained and supported by the opinions of the state agency reviewing psychologists.  However, Travis argues that the Step Three finding is flawed because the opinions rendered by his treating psychiatrist Dr. Kaza and the consultative examining psychologist establish the requirements of 12.04(A) and B(2) (marked limitations in social functioning) and B(3) (marked limitations in maintaining concentration, persistence and pace) and the ALJ did not properly weigh those opinions.  Doc. 17, p. 18.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ

must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 416.927(c). An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

The ALJ provided a thorough discussion of the medical opinions, including the opinions offered by both Dr. Kaza and Dr. Johnson Brown. Tr. 416-419.

The ALJ recognized that Dr. Kaza had a treatment relationship with Travis but concluded that Dr. Kaza's opinions from May 2012 and February 2014, which indicated that Travis had marked or extreme limitations in almost all functional areas requiring the ability to understand, use his memory, concentrate, persist at a task, or socially interact, were entitled to little weight for several reasons. Tr. 418-419. The ALJ discounted the opinions because they were provided in a checklist form without detailed explanation as to why Travis was so limited and the extensive limitations were inconsistent with Dr. Kaza's own medication management records and other objective medical evidence which the ALJ noted had been outlined earlier in his decision. Tr. 418. Additionally, the ALJ found that the stated limitations appeared to be based on Travis' own subjective complaints. Tr. 418.

Travis contends that the ALJ erred in weighing Dr. Kaza's opinion because he improperly focused on the form of the opinions rather than on the treatment records and longitudinal record. Doc. 17, pp. 18-19. Contrary to Travis' contention, the ALJ did not ignore

Travis' mental health treatment history.  Tr. 415-416.  The ALJ considered Travis' longitudinal record (Tr. 415-416) but found that Dr. Kaza's severe restrictions were inconsistent with those records (Tr. 418).  Travis has not shown that the ALJ failed to consider evidence.  And, while Travis disagrees with the ALJ's assessment of the evidence, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.

Additionally, as the ALJ observed, Dr. Kaza's opinions appeared to be based on Travis' subjective complaints and/or his opinions were not supported with sufficient detail.  This reasoning is supported by the record.  For example, in Dr. Kaza's May 2012 opinion, when asked to describe the medical/clinical findings that supported his assessment in the area of understanding and memory, Dr. Kaza indicated that *Travis complained of* forgetfulness; felt that somebody was watching him; and claimed he could not stay on task.  Tr. 264.  When asked to describe the medical/clinical findings that supported his assessment in the area of sustained concentration and persistence, Dr. Kaza indicated that *Travis complained of* difficulties in concentration and being unable to stay focused on anything.  Tr. 265.  And, *Dr. Kaza provided no comments* when asked to describe the medical/clinical findings that supported his assessment in the area of social interaction.  Tr. 265.  Also, in Dr. Kaza's 2014 opinion, when asked to describe the medical/clinical findings that supported his assessment in the area of understanding and memory, *Dr. Kaza provided no comment*.  Tr. 358.  When asked to describe the medical/clinical findings that supported his assessment in the area of sustained concentration and persistence, Dr. Kaza indicated that *Travis complained of* having a hard time remembering things.  Tr. 359.  And, when asked to describe the medical/clinical findings that supported his assessment in the area of social interaction, *Dr. Kaza provided no comments*.  Tr. 359.

Considering the foregoing, the undersigned finds that Travis has not shown that the ALJ failed to provide good reasons for discounting the opinions of Dr. Kaza or that the reasons provided are not supported by substantial evidence.

Travis also argues that the ALJ did not properly weigh the opinion of Dr. Johnson Brown. Doc. 17, pp. 19-20. Dr. Johnson Brown was not a treating source. Thus, her opinions were not entitled to deference under the treating physician rule. Additionally, even though Dr. Johnson Brown is not a treating source, consistent with the regulations, the ALJ provided a detailed analysis of her two opinions and provided reasons for assigning little weight to both opinions. Tr. 416-417. The ALJ found that Dr. Johnson Brown's opinions relied heavily on Travis' subjective reports of his symptoms[14] and limitations and the limitations were "vague" and "not quantifiable." Tr. 416. Travis argues that Dr. Johnson Brown conducted memory testing and offered her own objective observations regarding Travis' demeanor during the examination, noting that it was obvious at times that Travis was angry, irritable and had a flat and restricted affect. Doc. 17, p. 20. However, the ALJ did not ignore this evidence. *See* Tr. 416 (discussing Dr. Johnson Brown's observations during the examination). Rather, the ALJ considered the totality of the evidence, including Dr. Johnson Brown's observations, but found that Travis' reports of debilitating symptoms and Dr. Johnson Brown's severe limitations were not supported by the treatment notes. Tr. 416-417. Travis also argues that it was improper for the ALJ to take into account the lack of inpatient hospitalization for treatment of mental health symptoms when discounting the severe limitations set forth in Dr. Johnson Brown's opinions because the ALJ did not consider whether the lack of more intense treatment was the result of lack of insurance or financial reasons. Doc. 17, p. 20. Travis makes this argument but does not

---

[14] Travis does not challenge the ALJ's credibility assessment.

point to where in the record his physicians recommended inpatient hospitalization because his symptoms were so severe.

In sum, as a non-treating source, Dr. Johnson Brown's opinions are not entitled to deference under the treating physician rule.  Furthermore, the undersigned finds that the ALJ sufficiently explained the reasons for providing little weight to Dr. Johnson Brown's opinions and Travis has not shown that those reasons are not supported by substantial evidence. Additionally, Travis has not shown that the ALJ failed to consider evidence.  *See* Tr. 415 (discussion of Travis' past mental health treatment, including past reports of hallucinations and paranoia).  And as indicated above, it is not for this Court "to try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.

Considering the foregoing, the undersigned finds that the ALJ properly considered Travis' impairments under Step Three and properly weighed the medical opinion evidence. Accordingly, the undersigned recommends that the Court find no reversible error.

### VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

May 9, 2018

Kathleen B. Burke
United States Magistrate Judge


### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).